IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

WILLIAM THOMAS BAUBERGER,      )
                               )
                Petitioner,    )
                               )
     v.                        )          1:08cv15
                               )
GRADY J. HAYNES, Supt. of      )
Warren Correctional Inst.,     )
                               )
                Respondent.    )


**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge

On May 15, 2008, in accordance with 28 U.S.C. § 636(b), the United States Magistrate Judge filed a Memorandum Opinion and Recommendation ("Recommendation"). (Doc. 12.) Respondent (the "State") timely raised several objections to the Recommendation (Doc. 14), and Petitioner William Thomas Bauberger ("Bauberger") responded (Doc. 17). The court entertained oral argument on the objections on September 17, 2009. For the reasons set forth herein, the objections are overruled and the Recommendation is adopted.

**I.  BACKGROUND**

The facts are not in dispute and are set out in more detail in the Magistrate Judge's report. Those facts necessary to resolve the State's objections are set forth below.

On February 3, 2002, Petitioner Bauberger consumed in excess of ten beers over the course of approximately five hours at a Super Bowl party and then left via his car to visit a friend. En route, he drove the wrong way down an exit ramp of U.S. Highway 421 in Winston-Salem, North Carolina, and collided with a car driven by William Foy. Tragically, Foy's wife, a passenger, died within minutes of the crash.[1]

Bauberger was charged with second-degree murder, the lesser included offense of involuntary manslaughter, and assault with a deadly weapon inflicting serious injury. At trial after the close of the evidence, Bauberger conceded guilt as to the involuntary manslaughter charge only. A principal issue for the jury, therefore, was whether the state proved Bauberger acted with malice for a second-degree murder conviction. To prove malice, the state presented evidence that Bauberger (1) admitted to driving with a blood alcohol level of .20 on the night of the crash; (2) had at least two prior convictions for Driving While Intoxicated, as well as other driving offenses such as reckless driving; (3) disregarded road signs and other warnings on the night of the crash; (4) disregarded prior court orders not to drive; (5) drove that night despite having had his license

---

[1] Foy, who suffered a broken leg and hand in the accident in addition to the loss of his wife, appeared at the hearing on the State's objections pursuant to the Crime Victims' Rights Act, 18 U.S.C. § 3771(b)(2), and eloquently expressed the impact Bauberger's actions had on him and his family.

2

revoked; and (6) acted in a profane manner to emergency personnel and others at the scene of the crash.

After the presentation of evidence, the jury was instructed and began its deliberations at 11:48 a.m. on August 14, 2003. Shortly thereafter, the jury sent a note to the trial judge requesting a written copy of the instruction as to the elements of second-degree murder and manslaughter. The jury was brought into the courtroom at 12:11 p.m., and the court read the jury's question aloud. The trial judge noted that he did not have a written instruction in a form that could be readily submitted to the jury and re-read his charge for second-degree murder (including malice) and involuntary manslaughter. (Tr. Vol. IV at 35-43.) One of the jurors asked that they be permitted to continue to deliberate before the lunch break, and the jurors were returned to the jury room.

Shortly thereafter, the jury sent another note requesting "a copy of the fifth element of second-degree murder" -- malice, as well as a copy of any other elements to which the defendant did not stipulate. The jury's note advised, "Many of us are visual people." (Tr. Vol. IV at 44.) The trial judge returned the jury to the courtroom at 12:46 p.m. and advised them that he would have a clean copy of the elements prepared over the lunch recess for their use. Then a colloquy arose between several jurors and the trial judge. One of the juror's indicated,

"[b]asically, all we're looking for is that sheet," referring to the judge's instructions. Another juror corrected, "Well, that's not true." The previous juror said, "we would like to at least have that while you work on the other copy." And another added, "We wanted the second degree and manslaughter." (Doc. 3, Ex. 3, Tr. Vol. IV at 46.) The trial judge promised the jury copies after lunch and dismissed them at 12:47 p.m.

During the lunch recess, the jury foreman went to the Forsyth County Public Library and checked out Webster's New Collegiate Dictionary. He brought the dictionary into the jury room after lunch and, during deliberations that resumed at 2 p.m., shared with the jurors the definition of several of the words contained in the judge's instructions for "malice." Sometime at or after 2 p.m., one of the lawyers handed the judge a typed version of some portion of the instructions. Unfortunately the transcript does not reflect the contents of the document or when this occurred. This typed version was simply given to the jury after it had resumed its deliberations, per agreement of counsel. The bailiff also asked for a highlighter, presumably at the jury's request.

The jury deliberated for two hours after lunch and was returned to the courtroom at 4:08 p.m. when it advised that it had reached a verdict on one charge but was deadlocked 7 to 5 on the other charge. The court emphasized the jurors' duty to do

whatever they could to reach a verdict, to "reason this matter over together as reasonable men and women and to reconcile your differences if you can without the surrender of conscientious convictions" as to the weight of the evidence, and returned the jury to deliberate further at 4:10 p.m. (Tr. Vol. IV at 51-52.)

At 5:03 p.m., the foreman advised the court that the jury had moved to 10 to 2 on the remaining count. The foreman advised that in lieu of quitting for the day they would "keep on for a little while." (Tr. Vol. IV at 56.)

At 6:06 p.m., the jury returned a verdict finding Bauberger guilty of second-degree murder and assault with a deadly weapon inflicting serious injury.

Following the verdict, the court was informed that the jury may have consulted a dictionary during deliberations. Bauberger sought relief in a state court motion for appropriate relief three days after his sentencing. Having been unsuccessful in his appeals, he sought relief in federal court in this petition.

The Magistrate Judge issued a 39-page Report and recommends that the petition be granted. The State has filed multiple objections to the Report and Recommendation. This court reviews the objections *de novo*. 28 U.S.C. § 636(b)(1)(C). All of the objections have been carefully considered, and two that warrant discussion are addressed below.

## II.  ANALYSIS

### A.  Standard of Review

The State's first objection relates to the standard of review under 28 U.S.C. § 2254(d).  Section 2254(d)(1) provides that an application for a writ of habeas corpus shall not be granted unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  A state court "unreasonably applies" U.S. Supreme Court law when it "identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case."  Williams v. Taylor, 529 U.S. 362, 413 (2000).  "[T]he state court's decision must have been more than incorrect or erroneous[,] . . . [it] must have been 'objectively unreasonable.'"  Wiggins v. Smith, 539 U.S. 510, 520-521 (2003) (internal citation omitted).  The State objects to the Magistrate Judge's determination that the decision of the North Carolina Court of Appeals — finding that the dictionary was not an extrinsic influence on the jury's deliberations — was an unreasonable application of clearly established law.  (Doc. 14 at 4-9.)

The U.S. Supreme Court has clearly established that an extrinsic influence on a jury's deliberations violates a

defendant's Sixth and Fourteenth Amendment rights to an impartial jury, to confront witnesses against him, and to be present at all critical stages of his trial. See, e.g., Rogers v. United States, 422 U.S. 35, 38-40 (1975); Illinois v. Allen, 397 U.S. 337, 338 (1970); Parker v. Gladden, 385 U.S. 363, 364-66 (1966); Turner v. Louisiana, 379 U.S. 466, 473 (1965). Furthermore, "[u]nder clearly established Supreme Court case law, an influence is . . . [extrinsic] if it (1) is extraneous prejudicial information; i.e., information that was not admitted into evidence but nevertheless bears on a fact at issue in the case, see Parker, 385 U.S. at 364, 87 S. Ct. 468; Turner, 379 U.S. at 473, 85 S. Ct. 546, or (2) is an outside influence upon the partiality of the jury, such as 'private communication, contact, or tampering . . . with a juror.'" Robinson v. Polk, 438 F.3d 350, 363 (4th Cir. 2006) (citing Remmer v. United States, 347 U.S. 227, 229 (1954)).

Though the State correctly observes that the Supreme Court has not specifically held that a jury's use of a dictionary is an extrinsic influence (Doc. 14 at 8), "the relevant Supreme Court precedent need not be directly on point, but must provide a 'governing legal principle' and articulate specific considerations for the lower courts to follow when applying the precedent." Quinn v. Hayes, 234 F.3d 837, 844 (4th Cir. 2000) (citing Williams, 529 U.S. at 413); see Panetti v. Quarterman,

551 U.S. 930, 953 (2007) ("That the standard is stated in general terms does not mean the application was reasonable. [Section 2254(d)(1)] does not 'require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied.'"); Lockyer v. Andrade, 538 U.S. 63, 76 (2003) ("Section 2254(d)(1) permits a federal court to grant habeas relief based on the application of a governing legal principle to a set of facts different from those of the case in which the principle was announced."); see also Williams, 529 U.S. at 382 (Stevens, J., concurring) ("[R]ules of law may be sufficiently clear for habeas purposes even when they are expressed in terms of a generalized standard rather than as a bright-line rule.").

In this case, the North Carolina Court of Appeals generally identified the issue as being whether evidence of the jurors' resort to a dictionary was an impermissible extrinsic influence that violated Bauberger's Sixth Amendment rights. State v. Bauberger, 176 N.C. App. 465, 468-73, 626 S.E.2d 700, 703-05 (2006). Even though the Court of Appeals failed to rely specifically on U.S. Supreme Court case law, section 2254(d)(1) requires neither citation to nor awareness of such precedent. Early v. Packer, 537 U.S. 3, 8 (2002); Bell v. Jarvis, 236 F.3d 149, 158 (4th Cir. 2000) (en banc). Acknowledging juror misconduct, the Court of Appeals concluded that evidence of the

jury's resort to a dictionary was not extrinsic and did not violate the Sixth Amendment because such evidence "did not discredit defendant's testimony or witnesses; it concerned legal terminology." Bauberger, 176 N.C. App. at 473, 626 S.E.2d at 706. But resort to a dictionary is an extrinsic influence because it contains definitions of legal terms that were not presented during the trial, imparted by the trial judge in the jury instructions, or based upon the common knowledge, belief, or impression of the jurors.[2] E.g., Fields v. Brown, 503 F.3d 755, 778-79 (9th Cir. 2007); United States v. Vig, 167 F.3d 443, 450 (8th Cir. 1999). The North Carolina Court of Appeals' determination was therefore an objectively unreasonable application of the U.S. Supreme Court's clearly established test requiring that the issue of prejudice be examined, and the State's objection is overruled.

---

[2] The unreasonableness of a state court's application of U.S. Supreme Court precedent cannot be established by decisions of lower federal courts or state courts. Williams, 529 U.S. at 410. Nevertheless, the analysis of these decisions is persuasive in the objective inquiry before the court. E.g., O'Laughlin v. O'Brien, 568 F.3d 287, 305 (1st Cir. 2009); Lewis v. Mayle, 391 F.3d 989, 995 (9th Cir. 2004); Copeland v. Washington, 232 F.3d 969, 974 (8th Cir. 2000). Under Fourth Circuit case law, a juror's consultation of a dictionary constitutes an extraneous influence. United States v. Duncan, 598 F.2d 839, 866 (4th Cir. 1979); see McNeill v. Polk, 476 F.3d 206, 226 (4th Cir. 2007) (King, J., concurring). Furthermore, as the dissenting judge in Bauberger noted, this view is held almost universally. Bauberger, 176 N.C. App. at 477-79, 626 S.E.2d at 708-10 (Geer, J., dissenting) (citing state and federal cases).

**B.   Prejudice**

The more difficult question, which the court advised the parties to address during the September 17, 2009, hearing, is whether the jury's resort to the dictionary resulted in legally cognizable prejudice to Bauberger.  The State argues that, even if the dictionary was an extrinsic influence on the jury's deliberations, it was not so prejudicial as to impair Bauberger's Sixth and Fourteenth Amendment rights.  (Doc. 14 at 10-17.)  Specifically, the State contends that the definitions provided by the dictionary did not fundamentally alter the standard for "malice" when the jury's instruction is considered as a whole.  The North Carolina Court of Appeals failed to consider this issue insofar as it concluded that the dictionary was not an extrinsic influence.  Bauberger, 176 N.C. App. at 472, 626 S.E.2d at 705.  In any event, the State is not entitled to have prejudice considered based upon the deferential standard under the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254(d).  Fry v. Piller, 551 U.S. 112 (2007).

The parties agree that Bauberger is entitled to relief if the trial court's constitutional error "had substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).  A federal habeas court must grant relief if it is in "grave doubt" as to the harmlessness of the error.  O'Neal v. McAninch, 513

U.S. 432, 436 (1995); Fullwood v. Lee, 290 F.3d 663, 679 (4th
Cir. 2002). "'[G]rave doubt' exists when, in the relevant
circumstances, the question is so evenly balanced that the
reviewing court finds itself in 'virtual equipose' [sic] on the
harmlessness issue." Barbe v. McBride, 521 F.3d 443, 461 (4th
Cir. 2008); Fullwood, 290 F.3d at 679; accord O'Neal, 513 U.S.
at 435. The test is whether it can be said with fair assurance
that not a single juror's decision was swayed by resort to the
extrinsic influence of the dictionary. See Parker, 385 U.S. at
366 (holding that a defendant is "entitled to be tried by 12,
not 9 or even 10, impartial and unprejudiced jurors"); Lawson v.
Borg, 60 F.3d 608, 613 (9th Cir. 1995) ("[E]ven a single juror's
improperly influenced vote deprives the defendant of an
unprejudiced, unanimous verdict.").

    In O'Neal, the Supreme Court addressed the burden of proof
for harmlessness under Brecht. 513 U.S. at 436-37. Rather than
considering the question in terms of proof burdens, the Court
stated, the appropriate question to ask is: "Do I, the judge,
think that the error substantially influenced the jury's
decision?"[3]  Id. at 436-37. If the record is so evenly balanced

---

[3] The issue of burden of proof has been presented inconsistently by the
parties. In its objections to the Recommendation, the State argued
that Bauberger bears the burden of proving prejudice (Doc. 14 at 11),
relying on Judge King's concurring opinion in McNeill, 476 F.3d at
226-29. Bauberger contended in earlier filings that the State bore
the burden of rebutting a presumption of prejudice. (Doc. 11 at 15-
16.) At the hearing on the State's objections on September 17, 2009,

11

that "[i]t is extremely difficult to say," the judge is in grave doubt as to the harmlessness and "the petitioner must win." Id. at 437, 442.

"[A] juror's use of a dictionary is not an event that is inherently prejudicial." McNeill, 476 F.3d at 226 (King, J., concurring). The Magistrate Judge applied, and the parties did not object to, the following five-part test to assess the prejudicial impact of a juror's use of a dictionary during deliberations:

> (1) The importance of the word or phrase being defined to the resolution of the case. (2) The extent to which the dictionary definition differs from the jury instructions or from the proper legal definition. (3) The extent to which the jury discussed and emphasized the definition. (4) The strength of the evidence and whether the jury had difficulty reaching a verdict prior to introduction of the dictionary definition. (5) Any other factors that relate to a determination of prejudice.

Id. (King, J., concurring) (quoting Mayhue v. St. Francis Hosp. of Wichita, Inc., 969 F.2d 919, 924 (10th Cir. 1992)). Each factor is addressed in turn below.

### 1. Importance of the Words

There is no doubt that the defined words were significant to the resolution of the case. The Magistrate Judge noted that "the central issue between convicting Petitioner in this case of

_____

counsel for the State offered that it ultimately bore the burden regarding the Brecht standard, and Bauberger's counsel argued that in light of O'Neal the court should look to the record to determine whether grave doubt exists regarding the use of the dictionary and not focus upon the burden issue.

second-degree murder (to which he pled not guilty) or involuntary manslaughter (to which he conceded guilt) was whether he acted with 'malice.'" (Doc. 12 at 34.) The trial judge instructed the jury on "malice" as follows:

> Malice is a necessary element which distinguishes second degree murder from manslaughter. Malice arises when an act which is inherently dangerous to human life is intentionally done so recklessly and wantonly as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief.

(Doc. 3, Ex. 3, Tr. Vol. IV at 38.) Although malice is the distinguishing element between second-degree murder and manslaughter, State v. Cole, 280 N.C. 398, 402-03, 185 S.E.2d 833, 836 (1972); State v. Hall, 59 N.C. App. 567, 573, 297 S.E.2d 614, 617 (1982), the jurors never looked up the definition of "malice" during their deliberations.[4] Instead, they consulted the dictionary for the following words within the court's charge on malice: "recklessly;" "wantonly;" "manifest;" "utterly;" and "regard." Bauberger emphasizes the importance of the words "recklessly" and "wantonly" to the definition of malice (Doc. 3 at 15-17), implicitly conceding that the

_____

[4] A juror admitted that he looked up the definition of "malice" in his home copy of Webster's dictionary before the judge charged the jury. (Doc. 7, Ex. 4 at 4.) He testified that he could not remember the dictionary definition, did not copy it down, and did not share it with any other juror. (Doc. 7, Ex. 4 at 4.) Bauberger does not put significant emphasis on this event, focusing rather on the activities during the jury's deliberations. Based on the court's resolution of Bauberger's petition, this juror misconduct does not affect the outcome.

definitions of "manifest," "utterly," and "regard" lacked legal significance for purposes of his petition.

### 2. Difference in Legal and Dictionary Definitions

The next inquiry is the extent to which the dictionary definitions differed from the proper legal definition as to malice. A jury instruction "will be construed contextually, and isolated portions will not be held prejudicial when the charge as [a] whole is correct." <u>State v. Rich</u>, 351 N.C. 386, 394, 527 S.E.2d 299, 303 (2000).

The dictionary defined "recklessly" as "lack of due caution." (Doc. 7, Ex. 4 at 2.) "Wantonly" was defined as an "arrogant recklessness of justice or the feelings of others." (Doc. 7, Ex. 4 at 2.) Bauberger argues that these definitions effectively lowered the prosecution's burden of proof for "malice" to a standard closer to negligence. (Doc. 3 at 15-16; Doc. 11 at 17-18.) He also argues that because we do not know, nor are we permitted to determine, how the jury considered these definitions, we cannot say that the jury applied the correct legal standard. The State claims that the difference between the dictionary definitions and the jury instruction, when considered as a whole, was only "marginal at best" and, if anything, more favorable to Bauberger. (Doc. 7 at 13; Doc. 14 at 11-13.)

Because the defined terms were part of the definition of "malice," the court concludes that the jurors could not have reasonably substituted them for the definition of "malice" *in toto*. Thus, the question is whether the jurors' consideration of the dictionary terms in the context of the jury instructions prejudiced the verdict under the <u>Brecht</u> standard.

The trial judge's charge to the jury on malice, as noted above, provided that "[m]alice arises when an act which is inherently dangerous to human life is intentionally done so *recklessly* and *wantonly* as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief." (Doc. 3, Ex. 3, Tr. Vol. IV at 22-23)(emphasis added.)  The trial judge had contrasted this standard with that for involuntary manslaughter, with which Bauberger was also charged, which the court charged requires "culpable negligence." (Doc. 3, Ex. 3, Tr. Vol. IV at 24.)  "Culpable negligence," the court explained, requires either (1) a "willful, wanton, or intentional" violation of law governing the operation of a motor vehicle, or (2) an "inadvertent or unintentional violation of the law" that is "accompanied by recklessness of probable consequences of a dangerous nature when tested by the rule of reasonable foresight amounting altogether to a thoughtless disregard of consequences or a heedless indifference to the safety of others." (<u>Id.</u>)  The trial judge also instructed on

the meaning of "reckless" in the context of reckless driving, which the court directed required that the jury find Bauberger "acted carelessly and heedlessly in willful or wanton disregard of the rights or safety of others." (Tr. Vol. VI at 21-22).

The parties have not identified any case specifically defining "reckless" within the context of the requirement of criminal malice under North Carolina law.[5] As the Magistrate Judge noted, however, the North Carolina courts have clearly stated that malice for murder requires a "high degree of recklessness." (Doc. 12 at 36-37.) By reference even to the trial court's instructions for reckless driving and culpable negligence, the dictionary definition of "reckless" – "lack of due caution" – sets a lesser standard. See Rich, 351 N.C. at 395, 527 S.E.2d at 303. It is hard to understand, consequently, the State's argument that Bauberger somehow benefitted from this definition.

Unlike the term "recklessly," North Carolina courts have defined "wantonly" with respect to criminal statutes. State v.

---

[5] North Carolina courts have defined the term "reckless" in the civil context "to be merely a synonym for "wanton," which, in turn, is defined as "an act manifesting a reckless disregard for the rights and safety of others." Pleasant v. Johnson, 312 N.C. 710, 714, 325 S.E.2d 244, 248 (1985) (finding that for an employee to overcome the Worker's Compensation bar in suing a co-employee, he or she must show "willful, wanton and reckless" conduct, rather than simple negligence). Thus, even though recklessness may equate to wantonness, recklessness carries a heightened standard beyond "lack of due caution" in the civil context in North Carolina. It is difficult to imagine that the criminal standard would be any less demanding.

<u>Williams</u>, 284 N.C. 67, 72-73, 199 S.E.2d 409, 412 (1973); <u>State</u> <u>v. Davis</u>, 86 N.C. App. 25, 30, 356 S.E.2d 607, 610 (1987). "Wantonness . . . connotes intentional wrongdoing. . . . Conduct is wanton when in conscious and intentional disregard of and indifference to the rights and safety of others." <u>Williams</u>, 284 N.C. at 72-73, 199 S.E.2d at 412 (internal quotation marks and citation omitted). Furthermore, "[t]he words 'willful' and 'wanton' have substantially the same meaning when used in reference to the requisite state of mind for a violation of a criminal statute." <u>Davis</u>, 86 N.C. App. at 30, 356 S.E.2d at 610. "'Willful' as used in criminal statutes means the wrongful doing of an act without justification or excuse, or the commission of an act purposely and deliberately in violation of the law." <u>Id.</u> at 30, 356 S.E.2d at 610. These definitions set a standard that is higher than Webster's definition for "wanton" as "arrogant recklessness of justice or the feelings of others."

The State argues that, even if the dictionary definitions for "reckless" and "wanton" alone set a marginally lower bar, they could not have resulted in a materially lower standard when the remainder of the instruction is considered, as it must. Indeed, the instruction requires "an act which is inherently dangerous to human life" that is "*intentionally done* so recklessly and wantonly *as to manifest a mind* utterly without regard for human life and social duty *and deliberately bent on*

17

*mischief*." (Emphasis added.) The State argues that a standard of "lack of due caution" as to the "reckless and wanton" portion of the charge did not materially lower the overall standard for malice when the jury was required to find an "intentional" act "manifest[ing] a mind utterly without regard for human life and social duty and deliberately bent on mischief." The State's argument has some surface appeal. However, the question is not whether many or even most jurors would have employed the State's interpretation. Rather, it is whether at least one juror objectively could have considered the dictionary terms to permit a finding of malice based on a standard of carelessness, which is less than the wantonness and recklessness standard to which the State is to be held. The court finds that the difference in the dictionary and legal definitions is meaningful and that there is grave doubt that at least one juror reasonably could have read the instruction to adopt an impermissible lower standard.[6]

### 3. **Emphasis and discussion of definitions by jurors**

The next factor is the extent to which the jury discussed and emphasized the dictionary definitions. "[A]lthough a juror can testify that she consulted an extraneous influence and

---

[6] At best, inserting "lack of due caution" for the requisite recklessness standard appears to create a confusing instruction in that malice would then require an intentional act committed negligently.

related her findings to the panel, neither she nor any other juror can testify about *any* effect the extraneous influence may have had on the verdict or on the jury deliberations." <u>McNeill</u>, 476 F.3d at 226 (King, J., concurring) (emphasis added); <u>see</u> Fed. R. Evid. 606(b); <u>Fullwood</u>, 290 F.3d at 679-80.[7] Based on the affidavits of jurors, the foreperson shared the dictionary definitions with all other jurors after the lunch break. Any other testimony regarding any claimed emphasis given to the definitions or evidence of the actual impact upon jury deliberations is foreclosed by Federal Rule of Evidence 606(b).[8]

What is known is that the jury foreman sought out a dictionary after specifically advising the trial judge of the jury's interest in a definition for "malice," brought it into the jury room after lunch, and shared particular definitions with the other jurors. (Doc. 7, Ex. 4 at 2); <u>Bauberger</u>, 176

---

[7] North Carolina's evidentiary rules also impose the same limitations upon juror testimony of this type. <u>See</u> N.C. Gen. Stat. § 8C-1, Rule 606(b); <u>accord</u> <u>Robinson</u>, 438 F.3d at 359 n.10 (noting the state rule "is identical to its federal counterpart").

[8] Upon review of other courts' application of the third factor of the <u>Mayhue</u> test and of Federal Rule of Evidence 606(b), the relevant considerations for this factor seem to be how many jurors were exposed to the potentially prejudicial information and in what manner. <u>E.g.</u>, <u>United States v. Aguirre</u>, 108 F.3d 1284, 1289 (10th Cir. 1997) (pointing primarily to a juror reading aloud the dictionary definition to the other jurors); <u>Mayhue</u>, 969 F.2d at 925 (noting that the foreperson obtained and read the definitions to the others); <u>Lintz v. Am. Gen. Fin., Inc.</u>, 76 F. Supp. 2d 1200 (D. Kan. 1999) (discussing how two jurors consulted a dictionary regarding "malice" and "reckless," as well as how the foreperson told the two jurors they could not share the information with anyone else).

N.C. App. at 468-69, 626 S.E.2d at 703. It also bears importance that it was the foreman who carried out these activities, allowing a reasonable inference that the other jurors may have given the definitions more weight. See Mayhue, 969 F.2d at 925. Notwithstanding the limited inquiry permissible under this factor, the record demonstrates that several jurors expressed a need for the instruction (especially in a written form, such as was the dictionary) and that the definitions were shared by all twelve of them.

### 4. Strength of the Evidence and Difficulty Reaching a Verdict

The next consideration is the strength of the evidence[9] and whether the jury had difficulty reaching a verdict prior to the introduction of the dictionary definition.

The record contains extensive evidence to support a finding of malice and the other elements of second-degree murder. On the night of the incident, Bauberger was driving while impaired, with a revoked license, at high speed, and the wrong way on a freeway exit ramp. He was on notice as to the serious

---

[9] The court's inquiry into the strength of the evidence should not be misconstrued as a sufficiency of the evidence inquiry, which is inappropriate under the Brecht standard. See O'Neal, 513 U.S. at 438 (quoting Kotteakos v. United States, 328 U.S. 750, 764-65 (1946), which is the basis for the Brecht standard, that the "inquiry cannot be merely whether there was enough to support the result"). The court simply looks at the strength of evidence as a function of the total record to aid in its evaluation of how likely the jurors would give weight to the dictionary definitions.

consequences of his actions because he had been convicted on at least two previous occasions of driving while impaired, including one conviction one month before the incident. He also had been convicted of reckless driving and other traffic-related offenses.[10]

Despite this strong evidence, there is evidence the jury had difficulty discerning the meaning of "malice" prior to the introduction of the dictionary definitions. Shortly after the jury began its deliberations, it requested a copy of the law on second-degree murder and manslaughter. (Tr. Vol. IV at 35-43.) Within thirty minutes of that request, the jurors asked for a copy of the instruction for malice. (Id. at 44.) Although the jury knew that the judge agreed to provide a copy of the elements of second-degree murder after lunch, the foreperson

---

[10] Courts have previously held that such conduct may support a conviction of second-degree murder. E.g., State v. Westbrook, 175 N.C. App. 128, 135, 623 S.E.2d 73, 78 (2005) (upholding conviction of second-degree murder when defendant had been convicted of driving while impaired nine years earlier and was driving while impaired, speeding, crossing the center lane, traveling in a lane in the opposite direction, and running a red light); State v. Vassey, 154 N.C. App. 384, 391-92, 572 S.E.2d 248, 253 (2002) (upholding conviction of second-degree murder when defendant drove while impaired, with a revoked license, and with numerous prior convictions of those offenses); State v. Miller, 142 N.C. App. 435, 439-42, 543 S.E.2d 201, 204-06 (2001) (upholding conviction of second-degree murder when defendant was driving while impaired, was swerving prior to the accident, and had been convicted of driving while impaired, driving under the influence, and careless and reckless driving); see also United States v. Fleming, 739 F.2d 945, 947-48 (4th Cir. 1984) (upholding conviction of second-degree murder under federal law for defendant who was driving drunk, at an excessive speed, on the wrong side of the highway, and with prior convictions of driving while intoxicated).

took the unusual step of trekking to the local public library over the jury's lunch break to check out the dictionary (Doc. 7, Ex. 4 at 2). Bauberger, 176 N.C. App. at 468-69, 626 S.E.2d at 703. The foreperson subsequently shared the dictionary definitions with other jurors. The transcript also reflects an unusual colloquy between the judge and several jurors, giving rise to a reasonable inference that the concern as to the meaning of "malice" was not isolated. (Doc. 7, Ex. 4 at 2; Doc. 3, Ex. 3., Tr. Vol. IV at 46); Bauberger, 176 N.C. App. at 469, 626 S.E.2d at 703.

On the other hand, despite quickly seeking out the dictionary, none of the evidence demonstrates that the jury was at an impasse or deadlocked prior to obtaining the dictionary. Compare Mayhue, 969 F.2d at 926 (finding that "[t]he day before the definitions were read and the verdict was reached, the jury twice reported to the court that it was deadlocked."), with Marino v. Vasquez, 812 F.2d 499, 505 (9th Cir. 1987) (noting that the juror "had held out against a verdict of guilty of murder for nearly thirty days"). In fact, the jury asked for the instruction in part because some were, in the words of one juror, "visual people." The jury also reported an inability to reach a decision regarding one of the two counts on two occasions after learning the dictionary definitions at issue. (Tr. Vol. IV at 51, 54-55.)

Thus, the strength of the evidence weighs in favor of the State, but the jury's expressed concern over discerning the meaning of "malice" and apparent need for additional time to reach a verdict on one of the counts weighs in favor of Bauberger.

### 5. Other Relevant Factors

Finally, the amount of time that elapsed between the introduction of the dictionary definition and the verdict should be considered. Mayhue, 969 F.2d at 926 (finding that a juror's use of a dictionary definition prejudiced the defendant when the jury "reach[ed] a verdict less than three hours after the foreperson read the definitions"); Marino, 812 F.2d at 505 (finding that a juror's use of a dictionary definition prejudiced the defendant when the juror "changed his vote to guilty shortly after receiving the definition").

In this case, the jury continued to deliberate after the foreperson read the dictionary definitions. It did not return a verdict instantaneously or even soon after the introduction of the dictionary definitions. The jury instead deliberated for two hours before informing the court that it was deadlocked on one of the counts. (Doc. 3, Ex. 3, Tr. Vol. IV at 51.) Even after the court charged the jurors to deliberate further, another two hours passed before the jury returned a guilty verdict. (Id. at 57-58.) That the jury's deliberation for

approximately four hours after hearing the dictionary definitions was substantially longer than the period it had deliberated before receiving the definitions is of limited significance, because the dictionary was consulted so early in the deliberative process. Assuming that the murder charge was the charge upon which the jury was deadlocked (a fact not revealed in the transcript), it appears that the jury moved from 7/5 to 10/2 within three hours of consulting the dictionary and reached its verdict within another hour. All told, a verdict was reached within four hours of the misconduct. This factor therefore tips in favor of Bauberger.

Based on all these factors, the court concludes that it is extremely difficult to say whether the jury's resort to a dictionary as to the definitions of the component terms of the instruction at the heart of the charge – malice – had a substantial and injurious effect or influence in determining the jury's verdict. Improper prejudice regarding a single juror is sufficient grounds to grant a habeas petition. Here, all twelve jurors were exposed to the extraneous information. Evidentiary rules prevent the court from delving into the actual effect of the definitions on any juror, but such broad exposure creates a high likelihood that one juror may have been influenced by the dictionary definitions such that the standard in the judge's malice instruction was lessened. The court finds that the facts

in the record are at least evenly balanced so as to cause grave doubt as to the harmlessness of the jurors' misconduct. As such, the court agrees with the Recommendation to grant Bauberger's petition for writ of habeas corpus.

When juries resort to self-help in assessing the law – even when well-intentioned, they jeopardize the deliberative process and a defendant's fundamental rights under the Constitution to an impartial jury. The purpose of these rights is to "protect[] individuals from unconstitutional convictions and help to guarantee the integrity of the criminal process by assuring that trials are fundamentally fair." O'Neal, 513 U.S. at 442. As reprehensible as is Bauberger's conduct, he is entitled to the protections of the Sixth Amendment and thus a new trial as to the second-degree murder charge.

### III. CONCLUSION

The court has reviewed the portions of the Report and Recommendation to which objections were made and has made a *de novo* determination, which is in accord therewith, as supplemented by this Memorandum Opinion. The Magistrate Judge's Recommendation is hereby adopted.

IT IS THEREFORE ORDERED that the State's motion for summary judgment (Doc. 6) be DENIED and the petition (Doc. 1) be GRANTED.

IT IS FURTHER ORDERED that the writ of habeas corpus issue, and that Bauberger's conviction for second-degree murder in the case of <u>State v. Bauberger</u>, 02 CRS 51225, be vacated and set aside and the State of North Carolina unconditionally release Bauberger from custody unless, within a reasonable time of the date of entry of the Judgment in this case, Bauberger is re-tried on the second-degree murder charge.

IT IS FURTHER ORDERED that the parties inform the court whether there has been compliance with this Order.

A Judgment will be entered contemporaneously with this Order.

/s/  Thomas D. Schroeder
United States District Judge

October 27, 2009